UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA E. PEARSON, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 9474 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ADVOCATE HEALTH CARE, | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Cynthia Pearson brought this suit against Advocate Health Care, her former employer, alleging violations of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Doc. 23. Advocate has moved for summary judgement. Doc. 76. The motion is granted.

**Background**

The following facts are stated as favorably to Pearson as permitted by the record and Local Rule 56.1. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering Advocate's motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Advocate hired Pearson in 1999 as a Secretary II in the Administrative Office of the Emergency Department of Advocate Lutheran General Hospital. Doc. 102 at ¶ 7. Pearson was promoted to Secretary III in 2002. *Ibid*. Her responsibilities as a Secretary III included administrative and secretarial work, and the "behavioral expectations" listed in the Secretary III job description included "[w]orking as a team player … ; communicating with others

1

appropriately; listening and responding to others; handling conflict situations effectively; [and] fostering trust and respect within the team." Doc. 79-2 at 42.

Pearson's supervisor, Barbara Coyne, noted in Pearson's January 2004 review that she "needs to improve her communication with peers" and "[to] clarify issue[s] that upset her so that she can remain professional." Doc. 102 at ¶ 14. Later that year, Pearson participated in Advocate's Employee Assistance Program because of issues she was having with coworkers, including Jane Hynes and Terrie Sobeski. *Id*. at ¶ 13.

In Pearson's January 2005 review, Coyne noted that she "needs to continue to focus on communication with [Hynes]." *Id*. at ¶ 15. Advocate held multiple meetings in 2005 to address Pearson's issues with Hynes, but they did not succeed in resolving the conflict. *Id*. at ¶¶ 16-17. In Pearson's January 2006 review, Sobeski—who had replaced Coyne as Pearson's supervisor, *id*. at ¶ 18—noted that Pearson "worked hard last year to work through some communication issues with a co-worker [Hynes] and her efforts have paid off. She continues to be mindful of this situation and is using skills she learned to keep on the right track." *Id*. at ¶ 19.

In September 2007, Pearson participated in mediation with Hynes in an effort to improve their relationship. *Id*. at ¶ 20. Sobeski noted in Pearson's January 2008 review that she saw "little improvement" in Pearson's relationship with Hynes and that her expectations concerning Pearson's teamwork had "not been met fully." *Id*. at ¶ 21. Pearson received two Level 1 Corrective Action Notices for "Rude and Discourteous Behavior" toward Hynes, in February 2008 and March 2009. *Id*. at ¶¶ 22-23. Sobeski noted in Pearson's January 2009 and 2010 reviews that she should continue to work on her relationship with Hynes. *Id*. at ¶ 24.

Throughout this period, Hynes treated Pearson unprofessionally and disrespectfully. *Id*. at ¶ 41. Hynes yelled at Pearson on several occasions, failed to tell Pearson when she would be

off work, and slapped notes on Pearson's computer screen. *Ibid.*; Doc. 106 at ¶ 1. In October 2009, Hynes pressed her body against Pearson to block her from leaving, fanned paper in her face, and called her "ignorant." Doc. 102 at ¶ 35. On one occasion in 2012, Hynes deleted documents in a way that made Pearson unable to complete a task. *Id.* at ¶ 41. Pearson does not know what disciplinary action Hynes received. *Id.* at ¶ 51.

Pearson wrote a letter to colleagues—including Sobeski, Coyne, and Human Resources Manager Len Pawelski—to complain about the October 2009 incident, but the letter did not express a belief that Hynes's behavior was motivated by Pearson's race. *Id.* at ¶ 37. Sobeski and Pawelski investigated Pearson's allegations and concluded that there was no evidence of a hostile work environment. *Id.* at ¶ 38. A few months later, Hynes was relocated to a different unit and assigned a new supervisor. *Id.* at ¶ 39. Pearson filed a Charge of Discrimination against Advocate Lutheran General Hospital with the EEOC on October 23, 2009, *id.* at ¶ 3, but she did not file a lawsuit after the charge was dismissed, *id.* at ¶ 40.

Despite Hynes's move to a different unit, she and Pearson began to share certain responsibilities in 2010. Doc. 106 at ¶¶ 2, 13. Those shared responsibilities sparked renewed conflict. For example, Hynes sent Pearson an email on May 27, 2010 stating that a task "is pretty self-explanatory and a bit of common sense would show you how it is done." *Id.* at ¶ 2. Hynes sent Sobeski an email on July 8, 2010 stating that Pearson "was (and still is) just being defiant and trying to make me look bad, when in fact, she's the one that is making a fool out of herself.... *It's not rocket science!*." *Ibid.* Pearson felt harassed by this behavior. *Ibid.*

Pearson did not believe that Sobeski's performance evaluations of her were fair. At one point in 2010, Pearson complained to Sobeski that the office was "hostile" and that the working environment was "uncomfortable because only one side of the story is heard and accepted."

3

Doc. 102 at ¶ 42. Sobeski responded that she "heard both sides of the story" and "will continue to." *Ibid*. Also in 2010, Assistant Clinical Manager Jane Rice emailed Sobeski to complain that Pearson made Rice "very uncomfortable" when Pearson yelled at Sobeski "for all in the offices to hear." *Id*. at ¶ 25; Doc. 79-3 at 25.

In Pearson's January 2011 review, Sobeski stated that Pearson's "biggest area of opportunity is working as a team"; that "[t]here have been days when it is clear that Cynthia is not happy" and "is not conversant"; and that Sobeski "expect[s] more professionalism." Doc. 102 at ¶ 26. At Pearson's performance review meeting in February 2011, Sobeski told Pearson that she was upset with Pearson for filing the 2009 EEOC complaint and that their "Sister Relationship" was broken. *Id*. at ¶ 55; Doc. 79-3 at 30. In response, Pearson wrote Sobeski a letter dated February 11, 2011, stating that her performance review should be based on her work performance rather than Sobeski's "personal thoughts and feelings in regard to the EEOC situation." Doc. 79-3 at 30-31.

In June 2011, Sobeski gave Pearson an overall rating of "Expectations Exceeded," noting that there was "an overall improvement in [Pearson's] ability to work as a team," but that Pearson should be "aware of how loud she is at times. Gum snapping, sneezing, hiccups, etc." Doc. 102 at ¶ 27. After her performance review meeting in July 2011, Pearson emailed Sobeski, stating: "I did not understand how hiccups and sneezing played a role as a 'Behavioral Expectations' which are 'Human Reactions' of the body." Doc. 106 at ¶ 15. In June 2012, Sobeski gave Pearson an overall rating of "Meets Expectations," noting that Pearson "is supportive of office mates when she is not in a bad mood," but that she "is irritated easily," makes it "difficult to have an open and trusting relationship," "doesn't accept constructive

4

feedback," and "[e]asily becomes huffy."  Doc. 102 at ¶ 28.  Despite these uneven reviews, Pearson received a salary increase every year between 2006 and 2012.  *Id*. at ¶ 29.

Pearson believed that Hynes and Sobeski were allowed more flexible work schedules than she was.  Specifically, Pearson believed that Hynes and Sobeski were able to choose their days off, while Pearson was permitted to take time off only when someone else was covering the office.  *Id*. at ¶ 44.  There were also occasions when Hynes and Sobeski did not report their time off to their supervisors or to Pearson.  *Id*. at ¶¶ 44, 49; Doc. 106 at ¶ 1.  However, Pearson did not know whether Hynes or anyone else in her department was ever denied time off, and Pearson could not recall an instance when she had been denied time off.  Doc. 102 at ¶ 45.

Pearson never mentioned discrimination on the basis of race in a written complaint to anyone at Advocate.  *Id*. at ¶ 56.  But she did say "I'm being treated [differently] because I'm black" to Sobeski sometime in 2004.  *Ibid*.  Additionally, when asked at her deposition whether she mentioned being discriminated against on the basis of race, Pearson testified that "throughout this whole thing I probably had mentioned it to Lenny [Pawelski] maybe once or twice, you know."  *Id*. at ¶ 57; Doc. 79-1 at 74.  At another point (the record does not say when), Pawelski told Pearson that she was "the common denominator" and the "initiator of all the stuff that's been going on for all these years."  Doc. 102 at ¶ 59.

On October 11, 2012, Pawelski told Pearson that she was being terminated.  *Id*. at ¶ 61.  Pawelski later informed Pearson via email that the reason for the termination was "misalignment," meaning that "there was an environmental mismatch between the associate and the job expectations, the manager and/or other associates."  *Id*. at ¶ 64.

5

**Discussion**

After filing a Charge of Discrimination on October 17, 2012 and exhausting her remedies with the EEOC, Pearson timely filed this suit, which alleges several claims under § 1981 and Title VII. Doc. 23; Doc. 102 at ¶¶ 4-5. "The same requirements for proving discrimination apply to claims under Title VII [and] § 1981," *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010), and for ease of exposition, the court will refer to Pearson's claims as arising under Title VII.

Pearson opposes summary judgment as to only two claims: hostile work environment based on race, and retaliation. Doc. 100 at 7-15. She therefore has forfeited her other claims. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [an argument] in his brief opposing summary judgment, [the non-movant] lost the opportunity to urge it in … the district court … .").

**I. Hostile Work Environment Claim**

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "This prohibition encompasses the creation of a hostile work environment that is severe or pervasive enough to affect the terms and conditions of employment." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016) (internal quotation marks omitted). For Pearson's hostile work

6

environment claim to survive summary judgment, she must show: "(i) that her work environment was objectively and subjectively offensive; (ii) that the harassment was based on her race; (iii) that the harassment was pervasive or severe; and (iv) that a legal basis exists for holding [Advocate] liable." *Cable v. FCA US LLC*, 679 F. App'x 473, 476 (7th Cir. 2017); *see also Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895-96 & n.6 (7th Cir. 2016) (same).

The third element "is in the disjunctive—the conduct must be *either* severe *or* pervasive." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011), *aff'd*, 133 S. Ct. 2434 (2013). This means that "one extremely serious act of harassment could rise to an actionable level[,] as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). A court addressing whether a work environment is hostile must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). In so doing, the court must bear in mind that Title VII does not impose a "general civility code" in the workplace and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted); *see also McPherson v. City of Waukegan*, 379 F.3d 430, 438-39 (7th Cir. 2004).

Even construing the record in the light most favorable to Pearson, the acts of which she complains lack the severity or pervasiveness needed to establish the presence of a hostile work environment. Pearson bases her claim solely on "harassment from Hynes from 2003 to 2012 that occurred about 2-3 times a year." Doc. 100 at 9. Because none of those incidents constituted an "extremely serious act of harassment," *Hall*, 713 F.3d at 330, their frequency—two to three

7

incidents per year—is "too isolated and sporadic to constitute severe or pervasive harassment," *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that eight comments did not amount to actionable harassment and collecting cases); *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (holding that nine incidents over seven months did not amount to a hostile work environment). The most serious incident occurred in October 2009, when Hynes shook paper in Pearson's face, blocked her from leaving, and repeatedly said to her, "You're ignorant." Doc. 102 at ¶ 35. The physical contact Pearson experienced, however inappropriate, was relatively minor and occurred only once. And Hynes's statements, however impolite, did not constitute actionable harassment. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007) (noting that the Seventh Circuit "has on many occasions distinguished between harassing and merely objectionable conduct" and collecting cases).

Significantly, Pearson's interactions with Hynes did not unreasonably interfere with Pearson's work performance. *See Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (affirming summary judgment for the defendant on a hostile work environment claim, reasoning that the plaintiff offered no proof that she "was unable to perform her job because of the conduct of her supervisors and co-workers"). To the contrary, Pearson's position remained the same, she was not demoted or suspended, and her pay was not reduced. Doc. 102 at ¶¶ 7, 29. Considered as a whole, Pearson's evidence depicts, at most, "isolated incidents that were neither sufficiently severe nor pervasive to rise to the level of actionable harassing conduct." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 732 (7th Cir. 2009). It necessarily follows that no reasonable jury could find for Pearson on her hostile work environment claim. *See Malekpour v. Chao*, 682 F. App'x 471, 475 (7th Cir. 2017) ("We agree with the district court that Malekpour's interactions with his colleagues do not come close to the level of hostility necessary to support a

hostile work environment claim. The incidents he describes were infrequent (the district court noted that they were spaced out over six years) and were not so hostile as to alter the conditions of the victim's employment and create an abusive working environment.") (internal quotation marks omitted); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (affirming summary judgment against the plaintiff on her hostile work environment claim, reasoning that "[t]he evidence is insufficient to show a workplace permeated with discriminatory ridicule, intimidation, and insult"); *McPherson*, 379 F.3d at 439 (holding that a male superior's repeated "boorish" comments did not create a hostile work environment "due to the limited nature and frequency of the objectionable conduct").

A second and independent ground for summary judgment on the hostile work environment claim is that Pearson "offers no evidence that the alleged harassment was based on [her] race." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004). "While it is true that harassment need not be *explicitly* racial in order to be probative of a hostile environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005). Accordingly, Pearson must establish that the complained-of conduct was tied "in character or purpose" to her race. *Luckie*, 389 F.3d at 713; *see also Vance*, 646 F.3d at 470 ("Although a plaintiff does not need to identify an explicitly racial dimension of the challenged conduct to sustain a Title VII claim, she must be able to attribute a racial 'character or purpose' to it."). Pearson's only arguments regarding racial character or purpose are that "she was the only black person working in the EM Office" and that Hynes's using the word "ignorant" was a "proxy for an overt racial slur." Doc. 100 at 9.

9

Both arguments miss the mark. First, the Seventh Circuit has rejected the proposition that racial character or purpose may be inferred from the fact that the plaintiff was the only member of a protected class in the office. *See Loving v. Lew*, 512 F. App'x 616, 619 (7th Cir. 2013) ("[T]o survive summary judgment a plaintiff must produce evidence that the conduct was at least motivated by race. … [T]he fact that [the plaintiff] was the only black employee in her group is insufficient to support that inference."). Second, Pearson conceded that the definition of the word "ignorant" has nothing to do with race, Doc. 102 at ¶ 36; Doc. 79-1 at 27, and put forth no evidence that the word "ignorant" has racial overtones. Thus, "no reasonable jury could find that it was racial in character or purpose." *Luckie*, 389 F.3d at 714; *see also Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) ("Alleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race.") (brackets omitted). It follows that her hostile work environment claim fails for this reason as well. *See Lord*, 839 F.3d at 562 ("Because no reasonable jury could conclude that Lord was targeted for harassment because of his sex, summary judgment for High Voltage was appropriate."); *Zayas*, 740 F.3d at 1159 ("In light of the scant evidence in the record relating to this claim, we have no trouble holding that any hostility directed at or felt by Zayas was not connected with her ethnicity.").

## II.     Retaliation Claim

To withstand summary judgment on her retaliation claim, Pearson must present evidence that, considered as a whole, would allow a reasonable jury to conclude that: "(1) [she] engaged in protected activity; (2) [she] suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Boss*, 816 F.3d at 918. If she meets the first two requirements, Pearson may satisfy her burden on the third by showing that

she "was meeting [her] employer's legitimate expectations" and "was treated less favorably than similarly-situated employees who did not engage in protected activity." *Ibid*. Ultimately, the court must engage in a "straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [adverse employment action]?" *Lord*, 839 F.3d at 563.

Title VII prohibits an employer from taking an adverse employment action against an employee because she "engaged in a statutorily protected activity." *Cole*, 838 F.3d at 901. A statutorily protected activity is

> more than simply a complaint about some situation at work, no matter how valid the complaint might be. To be protected under Title VII, [the plaintiff's] complaint must have indicated the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.

*Ibid*. (internal quotation marks and ellipsis omitted). Pearson's only statements complaining of discrimination based on race—in other words, her only statutorily protected activities—were her 2004 oral complaint to Sobeski and her 2009 EEOC charge. Doc. 102 at ¶¶ 3, 56; *see Lauth v. Covance, Inc.*, 863 F.3d 708, 2017 WL 2979868, at *7 (7th Cir. 2017) ("Lauth's EEOC charges were protected activities for purposes of his retaliation claim."); *Cole*, 838 F.3d at 901 ("[The plaintiff's] argument is that he was *implicitly* complaining of race discrimination because he was the only African-American foreman or sub-foreman in the department and the only subject of the conduct of which he complained. But his membership in a protected class, without anything more, is not enough to transform his general complaint about improper workplace practices into a complaint opposing race discrimination."). Pearson's deposition testimony that she "probably" complained to Pawelski "throughout this whole thing … maybe once or twice," Doc. 102 at ¶ 57; Doc. 79-1 at 74, is too vague—in terms of both substance and timing—to provide a basis to find

11

retaliation, so it will not be considered further. *See Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 939 (7th Cir. 2016) ("At the summary-judgment stage, the plaintiff … must set forth by affidavit or other evidence *specific facts*.") (internal quotation marks omitted and emphasis added); *Jaburek v. Foxx*, 813 F.3d 626, 631-32 (7th Cir. 2016) (in affirming summary judgment for the defendant in an employment discrimination case, reasoning that the plaintiff's "vague testimony about her request for a desk audit [is not] enough to show that she applied for a promotion. She did not specify when she made this request, nor did she give any detail about what she said … .").

> Adverse actions for purposes of a retaliation claim include:
>
>> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012). "To rise to the level of an adverse action, a change must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity," *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) (internal quotation marks omitted), meaning that it "must be more disruptive than a mere inconvenience or an alteration of job responsibilities," *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (internal quotation marks omitted); *see also Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

Pearson's 2012 termination clearly qualifies as an adverse employment action. *See Dass*, 675 F.3d at 1069. But most of Pearson's other complaints—regarding Sobeski's criticism of her performance and rules about scheduling vacation time—do not come close to meeting that standard. "Instead, some appear to be commonplace management decisions, and others are merely petty slights or minor annoyances that often take place at work and that all employees experience." *Malekpour*, 682 F. App'x at 474 (internal quotation marks omitted). "Unfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice" as adverse employment actions. *Boss*, 816 F.3d at 919; *see also Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) (same). The same goes for the lack of flexibility in scheduling time out of the office. *See Griffin v. Potter*, 356 F.3d 824, 829-30 (7th Cir. 2004) (collecting cases involving nonactionable grievances, including "negative performance evaluations, unfair reprimands," and "refused preferred vacation schedule").

The 2008 and 2009 Corrective Action Notices present a closer question. Given that "written reprimands without any changes in the terms or conditions of [the plaintiff's] employment are not adverse employment actions," *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009), the court might have held that the Corrective Action Notices do not qualify, *see Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) ("With regard to her claim that the letter of reprimand constituted an adverse job action, the plaintiff-appellant ignores firmly established circuit precedent that a letter of reprimand is not an adverse employment action *unless the letter is accompanied by some other action, such as job loss or demotion*."). But because Advocate does not make that argument, and instead concedes that that the Corrective Action Notices *are* adverse employment actions, Doc. 105 at 11-12, Advocate has forfeited the issue. *See G&S Holdings LLC*, 697 F.3d at 538; *Judge v. Quinn*, 612 F.3d 537, 557

(7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties … .") (internal quotation marks and brackets omitted). The court therefore treats the 2008 and 2009 Corrective Action Notices as well as Pearson's 2012 termination as adverse employment actions.

The question then becomes whether Pearson has adduced sufficient evidence to show that "the desire to retaliate" for her statutorily protected activity (the 2004 oral complaint to Sobeski and the 2009 EEOC charge) was "the but-for cause" of her adverse employment actions (the 2008 and 2009 Corrective Action Notices and the 2012 termination). *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) ("To prevail on a retaliation claim requires proof that the desire to retaliate was the but-for cause of the challenged employment action."). Pearson fails to make this showing.

Pearson adduces no evidence whatsoever that her oral complaint to Sobeski in 2004 motivated any adverse employment action. Accordingly, no reasonable jury could conclude that the 2004 complaint caused her 2008 and 2009 Corrective Action Notices four years later or her 2012 termination eight years later. *See Nicholson v. City of Peoria*, 860 F.3d 520, 525 (7th Cir. 2017) ("The passage of more than a year between protected activity and the adverse employment action is enough to substantially weaken a retaliation claim.") (internal quotation marks omitted); *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 683 (7th Cir. 2001) (affirming summary judgment for the employer because the plaintiff "has offered no evidence that the disciplinary measures he is challenging were motivated … by his complaints of discrimination rather than by defendants' legitimate belief that such discipline was justified by [his] conduct") (brackets omitted).

Nor could a reasonable jury fire that a desire to retaliate for Pearson's 2009 EEOC charge caused her termination in 2012. (The EEOC charge was filed *after* Pearson received both Corrective Action Notices, and thus could not have caused those Notices to be issued. Doc. 102 at ¶¶ 3, 22-23.) Pearson adduces no evidence that her job responsibilities were altered or that she was subject to disciplinary actions during that three-year period. Instead, the record shows that Pearson received a raise each year, *id*. at ¶ 29, and at least one performance rating of "Expectations Exceeded," *id*. at ¶ 27.

The only potential evidence of causation is Sobeski's 2011 comment that she was upset about Pearson's 2009 EEOC complaint. *Id*. at ¶ 55; Doc. 79-3 at 30. But even if that were enough to establish a retaliatory motive, Advocate has demonstrated conclusively that Pearson would have been fired regardless of her EEOC charge. *See Lord*, 839 F.3d at 564 ("When confronted with circumstantial evidence of a retaliatory motive, the employer may show that the employee would have been fired even absent his complaints about harassment."). Pearson indisputably was not meeting Advocate's legitimate expectations, Doc. 102 at ¶ 8, as her personality conflicts with others at work were substantial, longstanding (occurring since at least 2004), and recognized by numerous coworkers both before and after 2009. *Id*. at ¶¶ 14-15 (Coyne); *id*. at ¶¶ 19, 21-24, 26, 28 (Sobeski); *id*. at ¶ 25 (Rice); *id*. at ¶ 59 (Pawelski). That nearly decade-long history of conflict, which persisted despite numerous efforts by Advocate to improve matters, reinforces the sincerity of Advocate's stated reason for terminating her—that there was an "environmental mismatch between the associate and the job expectations, the manager and/or other associates." *Id*. at ¶ 64. Moreover, Pearson has not put forth any evidence as to the treatment of similarly situated employees. *Id*. at ¶¶ 45, 51. On this record, then, "a reasonable fact finder would be compelled to believe [Advocate's] explanation" for Pearson's

termination, and so Pearson's retaliation claim cannot withstand summary judgment. *Lord*, 839 F.3d at 564; *see also Lauth*, 2017 WL 2979868, at *8 ("Lauth has not cited any evidence, other than his own speculation, that might indicate Covance used the litany of complaints and the documented history of his communication issues as a cover for its retaliatory motive. That speculation is insufficient to raise a question of fact, particularly in light of [his employer's] consistent, longstanding, and progressive concerns about his behavior."); *Ferrill*, 860 F.3d at 501 (holding that the plaintiff's retaliation claim "fails for lack of evidence of causation" in light of her "persistent resistance to improving her performance").

## Conclusion

Advocate's summary judgment motion is granted. Judgment will be entered in favor of Advocate and against Pearson.

August 14, 2017

United States District Judge